## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

JOHN OLAGUES,

                                 Plaintiff,

              - against -                                Case No.: 1:15-CV-02478-GHW

CARL C. ICAHN, HIGH RIVER LIMITED
PARTNERSHIP, ICAHN PARTNERS LP, ICAHN
PARTNERS MASTER FUND LP, ICAHN
PARTNERS MASTER FUNDII LP, and ICAHN
PARTNERS MASTER FUND III LP,                      Oral Argument Requested

                              Defendants.

----------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

Jack G. Fruchter
Abraham, Fruchter & Twersky, LLP
One Pennsylvania Plaza, Suite 2805
New York, New York 10119
Tel.: (212) 279-5050
Fax: (212) 279-3655

**Attorney for Plaintiff John Olagues**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .............................................................................1

SUMMARY OF FACTS ..........................................................................................2

ARGUMENT .............................................................................................................4

      I.      Section 16(b) is a Strict Liability Statute Having Only Four Elements ..................4

      II.    Plaintiff Has Alleged a Legally Sufficient Theory For Calculation Of the Premium For the Put Options ..................................................................................6

      III.   Plaintiff Has Plausibly Alleged Facts Showing That Additional Profits Remain To Be Disgorged Pursuant to Section 16(b) .............................................12

CONCLUSION ..........................................................................................................18

i

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)...............................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................4

*Bershad v. McDonough*,
    428 F.2d 693 (7th Cir. 1970) ............................................................................7

*Blau v. Lehman*,
    286 F.2d 786 (2d Cir. 1961)..........................................................................6, 11

*Donoghue v. Natural Microsystems Corp.*,
    198 F. Supp. 2d 487 (S.D.N.Y. 2002).................................................................5

*Feder v. Frost*,
    220 F.3d 29 (2d Cir. 2000).................................................................................4

*Gollust v. Mendell*,
    501 U.S. 115 (1991)...........................................................................................5

*Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*,
    156 F.3d 305 (2d Cir. 1998)...............................................................................4

*Herrmann v. Steinberg*,
    812 F.2d 63 (2d Cir. 1987).........................................................................8, 9, 12

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012).................................................................4

*Lerner v. Millenco, L.P.*,
    23 F. Supp. 2d 337 (S.D.N.Y. 1998)..................................................................4

*Lewis v. Levinson*,
    No. 77 Civ. 1481, 1978 U.S. Dist. LEXIS 17886 (S.D.N.Y. May 8, 1978).....................12

*Mayer v. Chesapeake Ins. Co. Ltd.*,
    877 F.2d 1154 (2d Cir. 1989).............................................................................8

*Morales v. Lukens, Inc.*,
    593 F. Supp. 1209 (S.D.N.Y. 1984)................................................................7-8

*Newmark v. RKO General, Inc.*,
    425 F.2d 348 (2d Cir. 1970)..............................................................5, 6, 7, 16

*Oneida Indian Nation of N.Y. v. State of N.Y.*,
    691 F.2d 1070 (2d Cir. 1982)...................................................................14

*Portnoy v. Memorex Corp.*,
    667 F.2d 1281 (9th Cir. 1982) .................................................................10

*Portnoy v. Texas Intern. Airlines, Inc.*,
    678 F.2d 695 (7th Cir. 1982) ..................................................................10

*Reece Corp. v. Walco Nat'l Corp.*,
    565 F. Supp. 158 (S.D.N.Y. 1981)............................................................7

*Reliance Elec. Co. v. Emerson Elec. Co.*,
    404 U.S. 418 (1972)..............................................................................11

*Rosen v. Drisler*,
    421 F. Supp. 1282 (S.D.N.Y. 1976).........................................................10

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)...................................................................13

*Schaffer v. CC Investments, LDC*,
    153 F. Supp. 2d 484 (S.D.N.Y. 2001).......................................................4

*Schur v. Salzman*,
    365 F. Supp. 725 (S.D.N.Y. 1973)............................................................6

*SEC v. Gruss*,
    859 F. Supp. 2d 653 (S.D.N.Y. 2012).......................................................13

*Stella v. Graham-Paige Motors Corp.*,
    232 F.2d 299 (2d Cir. 1956)...................................................................14

*Texas Int'l Airlines v. Nat'l Airlines, Inc.*,
    714 F.2d 533 (5th Cir. 1983) ..................................................................11

*Tristar Corp. v. Freitas*,
    867 F. Supp. 149 (E.D.N.Y. 1994) ............................................................8

**Statutes, Rules and Regulation**

15 U.S.C. § 78p(b) ....................................................................................................4, 6

17 C.F.R. § 240.16b-6(d) ......................................................................................6, 11, 17

Fed. R. Civ. P. 8(a) ......................................................................................................4

Fed. R. Civ. P. 8(a)(2) ..................................................................................................4

Fed. R. Civ. P. 12 .......................................................................................................4

Fed. R. Civ. P. 12(b)(6) ......................................................................................4, 13, 14

Section 12 of the Securities Exchange Act of 1934 ........................................................2

Section 16(b) of the Securities Exchange Act of 1934 .......................................... *passim*

**Other Materials**

JACOBS, ARNOLD S., SECTION 16 OF THE SECURITIES EXCHANGE ACT,
Vol. 16, § 3.07[1] (2001) ...............................................................................................6

Levine, Matt, *Who Is Doing What To Whom On Carl Icahn's Netflix Trades?*   DEALBREAKER,
October 2012.............................................................................................................17

Terry, Charles T., *Option Pricing Theory and the Economic Incentive Analysis of Nonrecourse
Acquisition Liabilities*, 12 AM. J. TAX POL'Y 273 (1995)..............................................15

Plaintiff, through his undersigned counsel, respectfully submits this memorandum of law in response to the motion to dismiss the Complaint ("Compl.") and the accompanying Memorandum of Law in Support of the Motions to Dismiss of Defendants Carl C. Icahn, High River Limited Partnership, Icahn Partners LP, Icahn Partners Master Fund LP, Icahn Partners Master Fund II LP, and Icahn Partners Master Fund III LP ("Defs. Br.") filed by defendants Carl C. Icahn ("Icahn"), High River Limited Partnership ("High River"), Icahn Partners LP ("Icahn Partners"), Icahn Partners Master Fund LP ("Icahn Master"), Icahn Partners Master Fund II LP ("Icahn Master II") and Icahn Partners Master Fund III LP ("Icahn Master III") (collectively, the "Icahn Entities" or "Defendants") .

## PRELIMINARY STATEMENT

This case boils down to one contested issue of fact - - whether Plaintiff has plausibly alleged that Defendants have failed to disgorge the proper measure of short-swing insider trading profits under Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"). Defendants do not, nor could they reasonably, deny they earned short-swing insider trading profits while statutory insiders of Nuance Communications, Inc. ("Nuance").   Defendants seek to limit those §16(b) profits to the $0.01 per share premium arbitrarily written as the price for put options (the "Put Options") sold by Defendants at the very same time as related call options (the "Corresponding Call Options").   However, objective market data related to arm's-length trading in similar options by other investors demonstrates that the Put Options were worth far more than $0.01 per share and, instead, also reflected a decrease in the price Defendants paid for the Corresponding Call Options.   Thus, the value received was $0.01 per share *plus* the lesser amount

1

which Defendants wrote on a piece of paper as the purported price they were paying for the Corresponding Call Options.

## SUMMARY OF FACTS

Nuance is a publicly traded company, the common stock ("Common Stock") of which is registered with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934.   Compl. ¶ 10.   Plaintiff is a shareholder of Nuance seeking to obtain a monetary recovery for the Company. Compl. ¶¶ 3 and 10.   Defendants High River, Icahn Partners, Icahn Master, Icahn Master II and Icahn Master III are a series of investment partnerships each of which through a series of corporate affiliations are under the common control of Icahn.[1]  Compl. ¶¶ 12-15.   Icahn makes all investment decisions for the investment partnerships.   Compl. ¶ 15.   As a result of this common control and joint activity, the Icahn Entities acted as a "group" beneficially owning more than 10% of Nuance's outstanding Common Stock subjecting them to potential §16(b) liability.   Compl. ¶¶ 12-16.   Thus, in a Schedule 13D filed with the Securities and Exchange Commission ("SEC" or the "Commission") on April 30, 2013, the Icahn Entities reported that they collectively owned 33,899,274 shares of Common Stock, which represented approximately 10.72% of Nuance's outstanding common stock.   Compl. ¶ 16.

The Icahn Entities, from May 1 to August 29, 2013, while subject to Section 16(b), sold the Put Options which gave the party purchasing the Put Option the right to force Defendants to

---

[1]Barberry Corp. ("Barberry"), is the sole member of Hopper Investments LLC ("Hopper"), which is the general partner of High River.   Beckton Corp. ("Beckton") is the sole stockholder of Icahn Enterprises G.P. Inc. ("Icahn Enterprises GP"), which is the general partner of Icahn Enterprises Holdings L.P. ("Icahn Enterprises Holdings"). Icahn Enterprises Holdings is the sole member of IPH GP LLC ("IPH"), which is the general partner of Icahn Capital LP ("Icahn Capital"). Icahn Capital is the general partner of each of Icahn Onshore LP ("Icahn Onshore") and Icahn Offshore LP ("Icahn Offshore"). Icahn Onshore is the general partner of Icahn Partners. Icahn Offshore is the general partner of each of Icahn Master, Icahn Master II and Icahn Master III.   Barberry and Beckton are 100 percent owned by Defendant Icahn.   Compl. ¶¶ 13-14.

purchase 18,538,476 shares of common stock at an exercise price of $12.30 with an expiration date of February 20, 2015.   Compl. ¶ 17.   At or about the same time, the Icahn Entities also purchased the Corresponding Call Options for the same number of underlying shares of Common Stock (*i.e.*,18,538,476 shares) at the same $12.30 strike price with the same expiration date of February 20, 2015 (the "Call Options").   Compl. ¶ 21.   The Put Options would expire or be cancelled on the earlier of February 20, 2015, or the date on which the Corresponding Call Options were exercised.   Compl. ¶ 21.   On August 29, 2013, the Icahn Entities exercised the Corresponding Call Options causing the Put Options to be cancelled or expired on that same date.   Compl. ¶ 22.

The Icahn Entities publicly reported that the premium they received for writing the Put Options was $0.01 per share.   Compl. ¶ 24.   However, transactions in Nuance put options on the Chicago Board Options Exchange ("CBOE") between May 1 and August 29, 2013 demonstrate that the market price for put options with similar terms ranged from $1.00 to $1.25 per share. Compl. ¶ 25.   Similarly, a survey of transactions in Nuance call options on the CBOE between May 1 and August 29, 2013 shows that the CBOE call options traded at higher premiums than those paid by the Icahn Entities for the Call Options.   Compl. ¶¶ 27-29.   For example, on May 9, 2013, the CBOE market price for call options with terms similar to the Call Options was $7.60 per share.   Compl. ¶¶ 27-28.   However, the Icahn Entities paid a premium of $6.63 per share for the Call Options they purchased on May 9, 2013.   Compl. ¶¶ 27-29.

Accordingly, the premium that the Icahn Entities publicly reported having received from selling the Put Options did not reflect the true economic value of those transactions or the actual consideration Defendants received for writing the Put Option.   Compl. ¶ 31.   Instead, the true premium Defendants received for the Put Options included the corresponding reduction or offset

received by the Icahn Entities in the premium they paid for the Corresponding Call Options.
Compl. ¶ 31.

**ARGUMENT**

The allegations of a Section 16(b) action are to be evaluated under the liberal pleading requirements of Fed. R. Civ. P. 8(a).   *Schaffer v. CC Investments, LDC*, 153 F. Supp. 2d 484, 486 (S.D.N.Y. 2001); *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 337, 344 (S.D.N.Y. 1998).    Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"   *Id.* (internal quotation omitted).   "A trial court considering a Rule 12(b)(6) motion must 'accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.'"   *In re Elec. Books Antitrust Litig*., 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)).

**I.      Section 16(b) is a Strict Liability Statute Having Only Four Elements**

Section 16(b) is a statutory right intended to "prevent[ ] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer. . . ."   15 U.S.C. § 78p(b) (1970).   Liability exists where there was "(1) a purchase and (2) a sale of securities (3) by … a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period."   *Feder v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000); *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

4

Section 16(b) imposes a statutory scheme of strict liability and disgorgement of profits when its terms are violated regardless of any degree of fault.   *See*, *e.g.*, *Gollust v. Mendell*, 501 U.S. 115, 122 (1991); *Donoghue v. Natural Microsystems Corp.*, 198 F. Supp. 2d 487, 490 (S.D.N.Y. 2002) (Sweet, J.) (citing cases).   It "matters not" that the defendant's "heart may have been pure and its motivations noble."   *Newmark v. RKO General, Inc.*, 425 F.2d 348, 353 (2d Cir. 1970).

Here, all elements are properly alleged and not contested.   Defendants were statutory insiders of Nuance, and in addition there were purchases, sales, and profits pursuant to Section 16(b).   The sole issue is the proper measure of profits.

Defendants contend that their short-swing profits are limited to the stated $0.01 per share premium they were purportedly paid for the Put Options written with respect to Nuance's Common Stock.   However, the true premium is the amount by which the Call Options written in tandem with the Put Options were discounted as a consequence of Defendants arbitrarily assigning a $0.01 per share price to the Put Options.

Plaintiff's contention that $0.01 did not reflect the true value of the Put Options is supported by: (1) The premium for which Defendants sold the Put Options was 99% less than the value of the trading price for comparable put options; and (2) Defendants paid a price for the Corresponding Call Options far below that prevailing in the market for comparable call options. Thus, the true premium received by Defendants for the sale of the Put Options is $0.01 per share *plus* the discount Defendants received off the price of the tandem Call Options.   The $0.01 price was merely a number written on a piece of paper and did not accurately reflect the value obtained by Defendants.

5

## II.  Plaintiff Has Alleged a Legally Sufficient Theory For Calculation Of the Premium For the Put Options

A defendant violating Section 16(b) must disgorge "any profit realized by him." 15 U.S.C. § 78p(b) (1970).  In calculating profits under Section 16(b), courts recognize the remedial purpose of the statute and "squeeze every possible penny of profit out of such transactions." *Blau v. Lehman*, 286 F.2d 786, 791 (2d Cir. 1961) (citing *Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943)). "'Any profit' is not limited nor confined; it is all-inclusive." *Schur v. Salzman*, 365 F. Supp. 725, 730 (S.D.N.Y. 1973).  The specific profit-calculation rule relevant to this motion is SEC Rule 16b-6(d), providing that:  "Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act.  The profit shall not exceed the premium received for writing the option."  17 C.F.R. § 240.16b-6(d) (emphasis added).  Therefore the question is: What was the amount of the premium received by Defendants' from writing the Put Options?

Plaintiff has alleged a legally cognizable method for valuing the "premium" for the Put Options.  It is hornbook law that "a purchase or a sale can occur although the consideration is not cash.  Valuation issues may then arise, yet this does not preclude realization of profit." ARNOLD S. JACOBS, SECTION 16 OF THE SECURITIES EXCHANGE ACT, Vol. 16, § 3.07[1], 3-222 (2001).

Thus, for example, courts have held that where an insider purchases an amount of securities that was sufficient to transfer to him voting control over the corporation, the purchase price for the securities properly includes the control premium.  *See Schur*, 365 F. Supp. at 730 (rejecting defendant's attempt to "fragmentize the purchase price" and including within profits the control premium for the purchase of securities); *Newmark*, 425 F.2d at 357 (short-swing profits include control premium calculated based upon evidence of control premiums in previous

purchases of the issuer's shares).   Indeed, in *Newmark*, the trial judge added a control premium of 15 percent to the Section 16(b) damages, incurred upon the defendant's exchange of securities for a control block of the shares of a newly merged corporation (*i.e.*, Frontier), on the basis of "evidence that previous purchases of large quantities of Frontier shares which had conferred control on the purchaser had been at a substantial premium, ranging from 15% to 26%." *Newmark*, *id.* at 357.   Thus, the judge based his calculation of profits on a survey of relevant market prices for the transfer of control shares, analogous to Plaintiff's survey of market values for the options in the instant case.   The Second Circuit also held in *Newmark* that "profits" may take any form, and need not consist of cash.   *Newmark*, *id.* at 355 ("Whether, upon divestment, the insider receives cash or property should be immaterial.").

*Bershad v. McDonough*, 428 F.2d 693 (7th Cir. 1970) is also on point.   There, the Seventh Circuit held that "[t]he commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock."   *Id.* at 697.   Section 16(b) must be read to carry out its remedial purpose and existing case law did not "exempt from the statute transactions which in *substance* fall within its ambit, despite attempts to evade liability."   *Reece Corp. v. Walco Nat'l Corp.*, 565 F. Supp. 158, 162-63 (S.D.N.Y. 1981).   Thus, for example, where a sale of securities has two "stages" or "phases" (analogous to the two legs in the instant transaction), the court will regard them as parts of a single transaction if "the transaction was structured with the expectation that one would not be carried out without the other."   *Reece Corp.*, 565 F. Supp. at 162.   Even if "there was no express legal tie between the two phases," the court will consider whether "from any standpoint of reality and substance, there was a single sale."   *Id.*; *see also Morales v. Lukens, Inc.*,

593 F. Supp. 1209, 1213 (S.D.N.Y. 1984) ("The sales . . . while treated as two separate parts of a larger transaction for bookkeeping and for appearance to the public, were in fact one transaction . . . ."). Thus, courts will inquire beyond the form of a transaction to its substance, in determining the scope of the consideration for a purchase of securities.

Also, a portion of the consideration for a sale of securities does not need to be formally designated as part of the purchase price for it to be considered part of the consideration. *See, e.g., Mayer v. Chesapeake Ins. Co. Ltd.*, 877 F.2d 1154, 1163 (2d Cir. 1989) (short-swing profits include portion of agreement settling pending litigation regarding change of control); *Tristar Corp. v. Freitas*, 867 F. Supp. 149, 154 (E.D.N.Y. 1994) (finding material issue of fact as to whether certain employment contracts were part of the consideration for the sale of securities). The insider will not succeed in artificially structuring the transaction so as to cast a component of the consideration for a sale of securities as an extraneous item, such as an incidental transactional expense. *Herrmann v. Steinberg*, 812 F.2d 63, 66 (2d Cir. 1987) is on point as there, a potential acquirer of a corporation was about to execute a tender offer when the corporation offered to buy back the shares then held by the acquirer and to pay the acquirer $28 million, in return for the cancellation of the tender offer plans. *Id.* at 64. Although the acquirer claimed that the $28 million was intended solely as reimbursement for expenses incurred in connection with the aborted tender offer, the Section 16(b) plaintiff maintained that the payment was rendered in part to reimburse the acquirer for the purchase of its shares. *Id.* at 65. The Second Circuit remanded with instructions to the trial court to determine the connection between the $28 million and the purchase of securities, stating that

> A more realistic picture of the transaction is revealed when the focus is shifted from the nature of the expenses reimbursed to what Disney received in return for its

8

> money.   Disney's objective in entering into negotiations with Reliance was to
> ward off its take over threat.   Success depended on neutralizing the two
> components of that threat:   Reliance's substantial holdings of Disney stock and its
> announced tender offer.   Reliance and Disney structured their agreement to make
> it appear that all Disney received in consideration for the $28 million was the end of
> one component of the takeover threat, i.e., the tender offer.   However, this discrete
> treatment has an appearance of artificiality.

*Id.* at 66.   Indeed, the all-inclusiveness of the term "profit" in the context of Section 16(b) is

demonstrated by the general rule that "[e]xpenses incurred in purchasing section 16(b) stock are

not deductible from short swing profits."   *Id.* (citing *Texas Int'l Airlines v. Nat'l Airlines, Inc.*,

714 F.2d 533, 541 (5th Cir. 1983); *Reece Corp.*, 565 F. Supp. at 166; *Lane Bryant, Inc. v. Hatleigh

Corp.*, 517 F. Supp. 1196, 1202 (S.D.N.Y. 1981); *Oliff v. Exchange Int'l Corp.*, 449 F. Supp. 1277,

1302 (N.D. Ill. 1978)).

The Icahn transactions were structured such that the Corresponding Call Options

purchased by Defendants and the Put Options written by them contained mutually offsetting terms,

such that Defendants' exercise of the Call Options caused the expiration of the Put Options.   *See

supra* ("Summary of Facts").   Thus, when analyzing the "premium" for the Put Options, the two

"legs" of the transaction should be considered as a single transaction.   In this single integrated

contract, consistent with the authorities discussed above, consideration in any form for the Put

Options constitutes part of the "premium," including discounts received by the put writer on the

purchase price for the Call Options.

Defendants effectively concede that Plaintiff has plausibly alleged that the premium paid

for the Put Options included some measure of a discount in the price paid by Defendants for the

Corresponding Call Options in their assertion that the Put Options and the Corresponding Call

Options formed a single "integrated" contract.   Defs. Br. at 8.   However, even in "integrated"

agreement, the components each have separate values.   Defendants are not for purposes of establishing their §16(b) liability allowed to assign a random value to one component of that transaction, *i.e.*, the sale of the Put Options, divorced from economic reality.   Indeed, it is axiomatic that, even in a Delta One transaction, the pricing of one leg of the transaction will affect the pricing of the second leg.

Although Defendants cite cases supporting the argument that the Court should not restructure a transaction in order to find Section 16(b) liability, here Section 16(b) liability is a given as Defendants concede that they are beneficial owners of 10% or more of the Common Stock.   Moreover, Plaintiff is not restructuring the mechanics of the transactions but, instead, as discussed above, looking to the substance of a transaction and analyzing its separate components in determining the scope of the consideration for the purchase and sale of securities.   Indeed, in several of the cases cited by Defendants (Defs. Br. at 10), the court held that the substance rather than form of a transaction should determine whether a sale or purchase of securities occurred, but found that, based on the unique facts of the case, the substance of the transaction did not constitute a sale or purchase.   *See, e.g., Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1284 (9th Cir. 1982) ("Portnoy draws our attention to a case in the Seventh Circuit where the court said that 'the commercial substance of the transaction rather than its form must be considered...' *Bershad v. McDonough*, 7 Cir., 1970, 428 F.2d 693, 697   However, the facts there were very different from those here. . . . If we had been faced with those facts we too might have regarded the use of the option as a sham and found the date of stock sale to be that of the option sale."); *Portnoy v. Texas Intern. Airlines, Inc.*, 678 F.2d 695, 698 (7th Cir. 1982); *Rosen v. Drisler*, 421 F. Supp. 1282, 1285 (S.D.N.Y. 1976) (option cancellations were not sham transactions meant to disguise genuine

purchases and sales of stock.).   In *Reliance Elec. Co. v. Emerson Elec. Co.*, cited by Defendants

(Defs. Br. at 10), the Supreme Court declined to treat a series of two sales *to two different*

*purchasers* as one simply because the only sign that they were two steps in a single sale consisted

of evidence of the parties' "intent," which is beyond the strict liability scope of Section 16(b).

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 424-25 (1972) ("To be sure, where

alternative constructions of the terms of § 16 (b) are possible, those terms are to be given the

construction that best serves the congressional purpose of curbing short-swing speculation by

corporate insiders.   But a construction of the term 'at the time of . . . sale' that treats two sales as

one upon proof of a pre-existing intent by the seller is scarcely in harmony with the congressional

design of predicating liability upon an 'objective measure of proof.'").   However, here Plaintiff is

not seeking to impose liability upon Defendants, rather Plaintiff is seeking to enforce Rule

16b-6(d) and recover "any profit derived from writing the option."

Finally, Defendants assert that a strict-liability statute "should be strictly construed."

Defs. Br. at 9-10.   However, here Section 16(b) liability is conceded and, in the context of profit

calculation the well-settled principle of law within the Second Circuit is that, in calculating profit

under Section 16(b), the court should recognize the remedial purpose of the statute and "squeeze

every possible penny of profit out of such transactions."   *Blau*, 286 F.2d at 791 (citing *Smolowe*,

136 F.2d at 239).   As the Fifth Circuit explained, "[w]e are not . . . computing profits in

accordance with what might be the custom of traders and speculators in the stock market.   We are

construing a federal statute. . . ."   *Texas Int'l Airlines*, 714 F.2d at 541 (quoting *Blau*, 286 F.2d at

792).   Plaintiff's method of valuing the premium for the Put Options is consistent with the

remedial purpose of Section 16(b) as explained above and is consistent with a realistic and

11

economic understanding of the nature and substance of the transactions at issue.   Thus, Plaintiff

plausibly alleges that profits remain to be disgorged by Defendants.

### III.   Plaintiff Has Plausibly Alleged Facts Showing That Additional Profits Remain To Be Disgorged Pursuant to Section 16(b)

It is well-settled law that the commercial substance rather than the form of a transaction

guides the court's analysis of the scope of the profits attributable to a transaction.   *Herrmann*, 812

F.2d at 66 (finding that the parties' structuring of a sale of securities to make a component of the

consideration appear to relate only to the tender offer had "an appearance of artificiality"). Here,

Plaintiff explained to this Court that, prior to the commencement of this action, the Defendants

admitted that they had violated Section 16(b) and paid to the issuer the reported premium of $0.01

per underlying share for the Put Options.   Letter from Jack G. Fruchter to the Honorable Gregory

H. Woods dated May 20, 2015 (Docket No. 22 at p.2).   Defendants disgorged the amount that

they purport to be the proper measure of short-swing profits by paying $0.01 per underlying share.

However, "the defendants' method of calculating the short-swing profits is clearly

designed to result in a minimal, if not the minimum conceivable, forfeiture."   *Lewis v. Levinson*,

No. 77 Civ. 1481, 1978 U.S. Dist. LEXIS 17886, at *3 (S.D.N.Y. May 8, 1978).   In *Lewis*, the

court declined to end its inquiry on the basis of the defendant's disgorgement to the issuer prior to

the lawsuit because the "plaintiff claim[ed] that the insider's liability [was] more than 2 ½ times"

the amount of that payment and thus the court had to "examin[e] the merits."   *Id.* at *4.

Similarly, the premium received from the writing of the Put Options should be computed to

include the discount received by Defendants in purchasing the corresponding Call Options written

in tandem with the Put Options.   Compl. ¶¶ 27, 29.

Defendants contend that no additional profits remain to be disgorged because the Put Options and the Corresponding Call Option were "integrated" financial instruments entered into between "long-term, substantial investors in the issuers, with their own valuation of the securities at issue . . . ."  (Defs. Br. at 2.)    However, the Put Options clearly had some independent value with the only factual issue being whether the $0.01 per share value written on a piece of paper by the Icahn Defendants represented their true value and the entire premium received from writing the Put Options.   Defendants' "integrated" instruments argument actually supports Plaintiff's theory of a *quid pro quo* reduction on the Corresponding Call Options premiums paid by the Defendants in exchange for lowering of the Put Options premiums they received.

In any event, Defendants' factual arguments are not properly considered on a motion to dismiss.   Instead, in deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor.   *SEC v. Gruss*, 859 F. Supp. 2d 653, 659 (S.D.N.Y. 2012) (Sweet, J.) (citations omitted); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 168 (2d Cir. 2012) (all conflicts and ambiguities are to be resolved in plaintiff's favor).   The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."   *Gruss*, *supra* (citations omitted).   Plaintiff is not required to either prove or place evidence before the Court in connection with deciding a motion to dismiss because a Rule 12(b)(6) motion "is not an occasion for the court to make findings of fact."   *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (§16(b) action).   Thus, Defendants' factual challenges to Plaintiff's method of calculating the premiums obtained for the Put Options and the corresponding profits realized upon their cancellation overreach the permissible scope of a motion to dismiss inquiry.

13

Tellingly, *all* of the cases cited by Defendants involve summary judgment or post-trial review rather than a motion to dismiss pursuant to Rule 12(b)(6).   (Defs. Br. at 10-11)   Indeed, the proper procedure for the court's review of this issue of calculating profits is for the plaintiff to show a Section 16(b) violation and to allege a "maximum amount of profits" taken by the insider – which is precisely our case since the Defendants have admitted to a Section 16(b) violation -- whereupon the burden shifts to the insider to prove that "the profits were less than this maximum." *See Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 302 (2d Cir. 1956).   This process of burden-shifting cannot take place upon a motion to dismiss, where no evidence is entered and the only issue is whether the plaintiff plausibly alleged a cause of action.   Thus, Defendants' factual arguments are premature.

Defendants base their arguments largely on a Wikipedia article regarding "Delta One" financial instruments.   (Defs. Br. at 3)   However, Wikipedia is not the proper subject of judicial notice by this Court because it ethics are inherently unreliable as it can be edited at will by the general public.   *See Wikipedia*, available at https://en.wikipedia.org/wiki/Wikipedia:Introduction (explaining that Wikipedia entries can be edited by anyone); *Oneida Indian Nation of N.Y. v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982) (holding that judicial notice is permissible only "when there is no dispute as to the authenticity of . . . materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible").   This Court may take judicial notice of the Black-Scholes options pricing formula to recognize that there are many variables considered in options pricing, all of which have been ignored by Defendants in arbitrarily valuing their Put

Options at $0.01.[2]   Charles T. Terry, *Option Pricing Theory and the Economic Incentive Analysis of Nonrecourse Acquisition Liabilities*, 12 AM. J. TAX POL'Y 273, 331 (1995).   However, even assuming arguendo that this Court may take judicial notice of a Wikipedia article, it would make no difference.   That the Put Options and Corresponding Call Options when viewed together have a *delta* of one does not answer the question of the correct value of each of the components of the purported Delta One instrument.

That question is answered by the Black-Scholes options pricing formula which takes into account such important factors as the implied volatility of the underlying stock, the time until option expiration, the current stock price, the strike price of the option and the risk free rate of interest.   Charles T. Terry, *Option Pricing Theory*, *id.* at 331, 336 (discussing the Black-Scholes options pricing formula and explaining that options prices increase when the underlying stock is volatile).   Thus, even if the Court were to take judicial notice that the Put and Call Option

---

[2]

The Model:

$$C = SN(d_1) - Ke^{(-rt)}N(d_2)$$

C = Theoretical call premium

S = Current Stock price

t = time until option expiration

K = option striking price

r = risk-free interest rate

N = Cumulative standard normal distribution

e = exponential term (2.7183)

$$d_1 = \frac{\ln(S/K) + \left(r + \frac{s^2}{2}\right)t}{s\sqrt{t}}$$

$$d_2 = d_1 - s\sqrt{t}$$

s = standard deviation of stock returns

ln = natural logarithm

agreements constitute "Delta One" integrated contracts, it is insufficient to explain why the premium for the Put Options was consistently set at $0.01 per share on all transaction dates.[3]

    Plaintiff is not required, as Defendants contend, to allege any "improper motivation" for the structure of the contracts (Defs. Br. at 8), which is not an element of a strict liability cause of action. *See Newmark*, 425 F.2d at 353 (stating that it "matters not" that the defendant's "heart may have been pure and its motivations noble").[4]   Instead, that the $0.01 price per share written down for the Put Options inaccurately reflects the true value of the premium received is sufficient to state a claim.   Furthermore, the possibility of speculative abuse is apparent.   Defendants could have written the Put Options and taken in the premiums with knowledge from inside information that the Put Options would never be exercised and that they would get to keep the premiums upon the expiration of the Put Options.

    Most importantly, Defendants are generally wrong that Plaintiff has alleged "no factual basis to ignore the integrated contracts' terms."   (Defs. Br. at 9)   In the Complaint, Plaintiff alleged:   "The fact that the price of the Call Options fluctuated between May 1, 2013 and August 29, 2013 while the price of the Put Option premiums received were consistently reported as $0.01, further demonstrates that the $0.01 price was a contrivance and did not reflect the true value of the consideration obtained by the Icahn Entities for writing the Put Options."   Compl. ¶ 30.   This allegation addresses the contrived *structure* of the transaction itself, in which the Put Option premiums were set as $0.01 across the board, regardless of the date of the transaction or any variations in the fundamentals that typically drive options pricing.   In addition, Plaintiff alleged

---

[3] Here, the options pricing is further complicated by the fact that the Corresponding Call Options are American-Style options rather than European-Style options (options with a fixed exercise date, for which the Black-Scholes formula was intended), further underscoring the necessity for expert discovery.

[4] An obvious motive for doing so would be to avoid additional liability under Section 16(b).

that the premiums for the Call Options varied from $5.88 to $6.87, demonstrating that Defendants did *not* set a fixed premium for the offsetting leg of the integrated contract—the leg that was not subject to liability pursuant to Rule 16b-6(d).   Compl. ¶ 29.   Finally, Plaintiff alleged that, in comparison to prevailing market prices, the premiums for the Put Options and Call Options were discounted.   *See supra* ("Summary of Facts").

Although Defendants argue that they valued the Put and Call Options agreements as "Delta One" instruments, this assertion does not explain why they priced the Call Options, which were deeply "in the money," significantly below prevailing market prices.   Indeed, this Court may take judicial notice of an article in *Dealbreaker* that analyzes an Icahn "Delta One" instrument in precisely the same manner as does Plaintiff in the instant case, noting that the premium for the put was most likely undervalued because a discount was taken on the premium for the call.   Matt Levine, *Who Is Doing What To Whom On Carl Icahn's Netflix Trades?*   DEALBREAKER, October 2012, n. 5 (noting that Icahn was "underpaying for the call and getting paid zero for the put, instead of pricing each leg at fair value").[5]   In short, Plaintiff has adequately amplified its claims with factual allegations showing that the reported premiums for the Put Options were a contrivance, and that the true "premium" included discounts Defendants received on the premiums for the Call Options.   At this stage in the litigation, Plaintiff's allegations are more than ample to withstand a motion to dismiss and warrant this Court's allowance of discovery to shed light on these above facts.

---

[5] This article is available at:
http://dealbreaker.com/2012/10/who-is-doing-what-to-whom-on-carl-icahns-netflix-trades/#call05

17

## <u>CONCLUSION</u>

Therefore, for all of the above reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated:   August 20, 2015

ABRAHAM, FRUCHTER
  & TWERSKY, LLP

/s/ Jack G. Fruchter
Jack G. Fruchter
Jeffrey S. Abraham
One Penn Plaza, Suite 2805
New York, New York 10119
Tel.: (212) 279-5050
Fax: (212) 279-3655
*jfruchter@aftlaw.com*
*jabraham@aftlaw.com*

**Attorneys for Plaintiff John Olagues**

18